### IRVING AIR CHUTE CO., Inc., et al. v. RUSSELL PARACHUTE CO.

#### No. 4478.

Circuit Court of Appeals, Third Circuit.

Feb. 3, 1931.

William G. Mahaffy, of Wilmington, Del. (Charles Neave and Alexander C. Neave, both of New York City, and Roy R. Rommel, of Washington, D. C., of counsel), for appellants.

Howson & Howson, of New York City (Hubert Howson, of New York City, Edward T. Noe, Jr., of Dayton, Ohio, and H. E. Knight, of New York City, of counsel), for appellee.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and THOMPSON, District Judge.

BUFFINGTON, Circuit Judge.

This case concerns balloon parachutes. As their name indicates, they are in form collapsible umbrellas. They are spread by the air in their descent. So far as shape, texture, and the like, their use for descent and their form of construction have been unchanged for a long time. Parachutes, as we shall see later, are of two kinds, those which are attached by cord to a balloon or aircraft and whose spread is caused by such attaching cord being drawn taut and broken when the parachute is used for descent, and those which are not attached. This attached type has long been known and has been employed in exhibition descents, carefully planned, from stationary balloons or slow-moving aircraft. But when the swift-moving air craft came into the World War, the parachute was not used by them. For while that war rapidly and tremendously developed the airplane, it is a fact that no accompanying development of the use of the parachute was made by the combined air forces of the Allies. The aviator was furnished with no means of escape, and, if anything happened to his machine in the way of fire, engine failure, bombing, or shooting, he had no means of escape, but was forced to face the inevitable drop to earth. The number of aviators thus killed or mutilated made a situation which called, not alone on individual inventors, but on governments, for betterment. But there was no answer to this S. O. S. call. So late as 1916 the Scientific American stated that there was no definite progress over the parachute models of 1850. Two years later, when an inquiry was made in Parliament to the British Air Ministry whether the government had taken up the question of parachute protection, the reply was: "Experiments are proceeding, but no parachute suitable for use from an airplane has been arrived at." As we now know and appreciate the subsequent birth and development of the life-saving parachute art, we can see clearly the reason why, even in the exigencies of the World War, no use could be made of the parachute on swiftly moving aircraft. In the first place, the parachute as then existing was attached by cord or rope to the aircraft. When the latter was disabled, it began falling to earth, and, if the aviator succeeded in starting with his parachute, he and it fell to earth at the same speed with the car. Now it is clear that where car and enclosed parachute travel at the same speed, the cord by which the parachute is attached to the car neither lightens nor breaks, with the result that there is no parachute spread. Moreover, when it was attempted to use the parachute as then attached, there was a possibility of its shroud lines becoming entangled in the airplane and

thus rendering its instant use impossible. These momentous objections, pregnant with death to the aviator, are shown in the record. In the principal patent in suit, hereafter referred to, the specification, referring to these attached parachutes, properly says: "This type of parachute has a decided disadvantage, in that it depends on the aviator being able to jump and drop away from the airplane in order to extend the parachute and cause it to open. If the airplane is falling and the aviator away from it, he may then merely fall with the plane." In other words, both plane and parachute dropping at the same speed, the attaching cord will not break, and consequently the parachute will not spread.

We here take occasion to say, as we shall hereafter see, that at the conclusion of the war there had been no solution of this frightful menace to the lives of aviators. We are now referred to a patent granted by the French government to one Bacque in 1914—a patent which found lodgment in the mind of the court below and from which, in part, it drew the conclusion that the life-saving device hereafter referred to, and which is the disclosure of the patent here in suit, could largely have been evolved from Bacque. But in spite of this inference of the learned judge, drawn years after, the fact remains that, notwithstanding the tragic calls of the Allies for a life-saving parachute, Bacque and all prior patentees, designers, and users, and, indeed, although this Bacque patent was granted by the French government and France was the field of work of the aviators, no use was made by that government of Bacque's device, nor indeed by any one else, until long after the present effective life-saving device was disclosed, and then twenty odd years after Bacque's patent was granted, it was posthumously exhumed from its deserved obscurity and nonuse and used by experts to befog, belittle, and discredit the life-saving device here involved. But the situation does not rest here alone.

After the United States entered the war and it was realized by our scientific authorities in France that efforts must be made to meet the emergency, that body cabled home that the matter should be taken up here, and that Smith, the present patentee, who was then in the air service of the United States, be set to work making a life saving parachute. Now while the idea of an unattached parachute—that is, one that had no rope or cord attaching it to the airchaft—was, of course, not new with Smith, and the possibilities of such an unattached one had been

discussed and attempts made to construct one, the fact remains that no one had solved it, and the proofs show that no one had made a free jump, that is, one where the aviator jumped into space, with no cord attached to the aircraft, and trusted to the mechanism he carried to insure his safety. Smith testified that the death of Roland Gargle, an aviator, which was caused by the fouling of his drop line, led him to devise an unattached pack. He says: "Being familiar with parachute packs, I conceived the idea of a pack that would not open when you left the plane; that you could drive a plane into an enemy plane and before you hit it, drop a distance of several hundred feet, or drop some distance before you released the parachute. Next to that, I had found that all that was required of a parachute was to release it in the air; that would open it. When you release the parachute, there is one thing that opens the parachute, that is the air that is blowing in it. The parachutes I knew, or the only ones I saw, I believe, in those days, were the attached type of packs, the connecting rope attached to part of the pack and the other end of that rope attached to the airship you were dropping or jumping from. That was nominally known as the automatic type parachute, the person only had to jump and was not required to do anything else. But the limitations of that were that you had to jump or fall, and it was generally restricted as to ways you could get away; there was generally only one way you could jump or fall, because if you jumped the wrong way around the strut or wire or something, then you would have to fall the whole length of your parachute around that before you could get free from the chute."

Smith's developing work was done in connection with the United States Aeronautic group, which took up the matter in response to the order from France. That body collected all known devices, some fifteen in number, and found nothing in them, individually or collectively, which solved the problem. These tests were of a most thorough character, one of the witnesses taking part in them testifying as follows: "My attention is called to Chapter 2 of the Manual, Plaintiffs' Exhibit 10, which is headed 'History of development of parachutes', and it starts on page 12. After a summary of when the work was started on parachutes, the following appears: 'While this was being done overseas, the technical division in America was carrying on extensive experiments with American, as well as various allied and German para-

chutes, a synopsis of which follows.' There then follows a list of 15 different types of parachutes. I examined or made tests, or assisted in making tests, upon all of the parachutes mentioned in the list." Without entering into all the types thus examined, we note that during these experiments no successful jump for life was made from any of these devices, or had ever been made from them, and that during the experiments and due to the attaching line getting fouled, Lieutenant Caldwell, an aviator, was killed. It will be noted also that, when an attempt was made to reconstruct one of these devices and a free jump was made therewith, the aviator would have been killed and was only saved by the Smith device. In the end they settled on Smith's pack, which was a free or nonattached one which had no operative connection with the aircraft, and which, when the aviator leaped from the car with the pack strapped to his back, the pack contained the stored parachute and the means to release it in midair, and which means were controlled and operated by the aviator pulling a release cord attached to his breast. Tests were made with Smith's device from December, 1918, to April, 1919, by using a dummy, and these proved so successful that on April 28, 1919, Aviator Irving, provided with a Smith pack, jumped over the side of an airplane for the first time in aeronautic history. Irving's testimony as to this pioneer jump is as follows: "Major Hoffman requested me to make the jump after they had made numerous tests on parachutes designed by Mr. Smith. Major Hoffman requested me to make the first jump considering from my past experience I would be able to give him a more clear description of the operation, because at that time nobody had made a free type jump, or at least not to our knowledge. Major Hoffman is chief of the equipment section. When I testified that they had made experiments, I referred to the Parachute Department at McCook Field, and of which at that time I believe Mr. Smith was the head immediately under Major Hoffman. I was willing to make this jump because I was convinced that the parachute would work, and I was convinced that a man could operate a parachute himself while falling. There was not any doubt in my mind of that, although there was doubt in other people's minds, but I do not believe there was doubt in the people's mind who had actually worked on the parachute at McCook Field. I never made a free jump with my own type of parachute because it would not have made a successful free type chute, and it was not de-

signed for that in the first place. I submitted this type of parachute I have referred to as my own design to the authorities at McCook Field in 1918. This type of parachute which I designed was not adopted by the Army. Prior to my making a jump with the Smith type pack in 1919, I had never known of any free type parachute jump."

Following a favorable report to the government of the Smith device, it was adopted, and in June, 1919, the government ordered four hundred Smith packs. As a result of the success of these packs a government regulation now forbids any aviator to make a flight unless provided with a nonattached pack. The Smith pack found instant favor. During the years 1919–1930, the government bought over seven thousand; twenty-five foreign governments have bought or ordered eight thousand five hundred; the sales generally have been twenty thousand, and, until the defendants entered in competition, the plaintiff company had the exclusive trade. The proofs show that there is a record of two hundred and fifty lives saved by these Smith packs and one pack has a record of saving three lives. The packs sell for approximately three hundred dollars and stand five years' use.

Seeing then these really startling results, we naturally inquire of what does this pack consist? The pack is simplicity itself. Smith's commercial packs are made under his three patents, all of which are here involved, viz. claims 1, 2, 3, 4, 10 of patent No. 1,340,423; claims 5 and 8 of patent No. 1,403,983; and claims 1, 11, 12, 15, 18 of patent 1,462,456. From them we gather that in his pack a folded up parachute is inclosed in, but not connected to a parachute enveloping covering made of flexible material, adapted to be folded over so as to completely cover the folded parachute and provided with special fastening means, which latter fastenings are themselves protected by fastened shields, flaps, or covers, so arranged, constructed, and made releasable that each and every one of these fastening is instantly and simultaneously released and the enveloping covering also thrown back by a pull of a breast cord by the aviator as he jumps. When this is done, the boxlike covering collapses and becomes a flat surface. The covering has no metal parts or rigid corners which can engage the parachute or its shroud lines. In one form the flexible enfolding sheet is provided with four edges or flaps which when folded over are adapted to be fastened to their fellows or, as his 1,340,423 patent says, "releasable fasten-

ing means between each edge of the sheet and some other portion of the sheet." As we view it, the simultaneous release of the side and end flaps—and indeed all fastenings—is of vital functional importance, for only in this way can the complete release of the folded parachute be effected. It will be noted also that as a general thing aviators have their parachutes strapped to their backs and wear them constantly. Being thus liable to strike against machine and other parts, there is danger that these fastenings may be bent, distorted, the parachute torn or prematurely released. The grave danger to the aviator incident to a premature escape of the parachute while the plane is traveling at high speed is shown by the testimony of an aviator who had made two hundred jumps: "It is necessary to guard these parts because in the operation of the parachute it is essential that the pins and rip cords can be quickly and surely removed when so desired and if they are not protected they may become bent or injured in such a way that they cannot be quickly and readily removed. The object of covering any portion of the rip cord is so that it will not become jammed against a part of the aeroplane or accidentally caught in some part of the aeroplane and pulled out at a time when it is not desired to have the pack opened. Such accidental opening might result in a fatal accident, as the rush of wind is so great that the parachute might come out of its pack before the aviator is clear of the plane and it may go into the rudder or control surfaces of the aeroplane and drag the jumper after it into the plane." This danger is avoided by the secondary or auxiliary flaps hereafter referred to.

Without here entering into detail, we find in the fourth claim of Smith's patent, No. 1,340,423, which reads as follows: "In combination, a parachute folded into a compact mass and having a suspending member, a sheet of flexible material folded about said parachute and leaving the free end of said member projecting therefrom, a series of releasable fastening means for securing said sheet in its folded condition, a body harness connected to said suspending member, and a releasing device associated with said fastening means and extending to the front of the harness"—a general description of his pack.

His second patent, No. 1,403,983, provides for an auxiliary guard flap, to which and to the vital importance of which reference has been heretofore made. It goes without saying the use of a guard flap is in itself old and its use on any device of an ordinary character might not involve invention, but when we see how vital and all-important such a device is in keeping all the fastenings of Smith's pack securely guarded against accidental, unintentional, and premature unloosening, and yet, when the sudden emergency comes, that it is capable of being simultaneously and by the same unitary pull opened with all the other fastenings of the pack, we can appreciate how vital is its presence and how possibly fatal its absence.

The third patent, No. 1,462,456, provides for, in combination, a further form of flexible sheet, or, as stated in claim 18, a "flexible sheet comprising a body approximately rectangular in shape and flaps at the four edges."

We find nothing in the proofs or prior uses, or in the prior patents, which invalidates or narrows the construction of the claims alleged to be infringed. The defendant's pack is manifestly based on, and largely copied from, Smith's. Indeed there is nothing in prior devices which it more closely resembles than it does Smith's. Moreover, it is clear to us that whatever contention may be made that it is drawn from such prior art, it is apparent that, if it utilized individual elements found in such earlier devices, it carefully omitted from such adoptions those things which were essential to the working of such prior devices but whose use in the defendant's pack would have been suicidal. In that regard it suffices to refer to the defendant's nonuse of Bacque's complicated releasing mechanism, comprising, as it does, a pushing device, a wheel, eccentrics, springs, levers, notches, pawls, tangential lever, flexible guide control, pulley, and depending pawl. The contrast between this complicated mechanism with Smith's simple structure of pins, wire, and grommets all carefully protected, shows that it was from Smith, and not from Bacque, the defendant got the functional dependability and simplicity which goes to the saving of the aviator. The proofs show that whatever is done by a jumping aviator must be done in approximately the first hundred feet of his descent, for after that he is largely powerless to act or indeed think. In that regard one of our court in our conference said, in substance: The pack must be free from complicated mechanism. It must be entirely simple. Simplicity is imperative to provide instant, continuous, and dependable operation. In some arts a mechanism that works ninety-nine times in a hundred may be said to be successful, since such failure may result only in annoyance, delay, cost,

and the like. But when it comes to a parachute in mid-air, every failure means mutilation or death. Therefore, the device must work every time and to work every time it must be simple and practically foolproof in its simplicity, and to that end the releasing mechanism and the fastenings must at the same time be guarded against injury, premature release, etc. So, also, the aluminum casing essential to the Van Meter device finds no place in the defendant's device, and moreover the proofs fail to show that either Bacque's or Van Meter's devices were ever used to save a life in an air free jump.

Without entering into other details or here discussing the other questions raised, all of which have been duly considered, we have reached the firm conviction that the Smith patents and the Smith pack made a signal contribution to aeronautics, and that the defendant has wrongfully trespassed on Smith's patent rights. We accordingly reverse the decree below and remand the case, with directions to reinstate the bill, decree the claims in issue valid and infringed, and that an accounting be made.